GEORGE, The (MUTUAL SAFETY INS. CO. v.). See Case No. 9,982.

GEORGE (UNITED STATES v.). See Cases· Nos. 15,197–15,199.

GEORGE BELL, The (GUIBERT v.). See Case No. 5,856.

## Case No. 5,331.

### The GEORGE BURNHAM.

[1 Hask. 381.] [1]

District Court, D. Maine. Jan., 1872.

SEAMEN— GROUNDS FOR DISCHARGE AT INCEPTION OF VOYAGE — FAILURE TO PROVIDE SUITABLE CLOTHING FOR VOYAGE — WAGES — CARRYING SHEATH KNIVES.

1. Shipping articles, containing a clause prohibiting seamen from wearing sheath knives, approved, as in accord with the act of congress of July 27, 1866 [14 Stat. 304].

2. A discharge of seamen by the master at the inception of the voyage, for not providing themselves with suitable clothing and bedding for the ordinary perils and risks of the voyage, is justifiable.

3. It is an implied obligation on the part of seamen, as a part of their contract, to thus prepare themselves to perform their contract duty.

4. A discharge of seamen by the master at the inception of the voyage is justifiable, when they are quarrelsome and intend mischief.

5. Seamen, so discharged, are entitled to demand wages only for the time they have actually served.

In admiralty. Libel in rem, by three seamen, demanding wages for the entire voyage for which they had shipped, and for damages for breach of contract in being wrongfully discharged at the inception of the voyage. The claimants appeared and answered that the master discharged the seamen for sufficient cause, and tendered them their wages for the time they had actually served.

Thomas B. Reed, for libellants.

Melvin P. Frank, for claimants.

FOX, District Judge. This libel is promoted by three of the crew. They shipped on board the brig on the 12th of December, for a voyage from this port to Cuba and back to her port of discharge. The shipping articles provided that no advances should be made abroad to the crew, and that they were prohibited from wearing sheath knives. The court cannot but commend the insertion of this latter clause in the articles, and the attempt to bring home to the crew positive knowledge of the prohibition of their use of so dangerous an instrument, thereby giving effect to the provisions of the act of congress of July 27, 1866, by which the wearing of sheath knives by seamen in the merchant service is prohibited, and the master or officer in command is required to inform every person offering himself to ship of the provisions of the act, and to require his compliance with the law, under a penalty of fifty dollars for each omission. The crew came on board between two and three

o'clock of the afternoon of the 27th, having been ordered to be there immediately after dinner. The brig was then at Merchant's wharf. The libellants assisted in loosing the sails and endeavoring to get the vessel under way, but she touched on the banks, and the sails were furled and all hands were allowed to go on shore till about eleven o'clock at night. They then returned, but could not succeed in hauling the brig out of the dock, as she was still aground. The crew again left and returned the next morning, at which time the master discharged the libellants, and refused to allow them to go in the brig, although they all expressed their desire to complete the voyage. At that time the master informed them that he had learned they were quarrelsome fellows, who would make trouble on board, and that they were not provided with proper clothing and bedding necessary for the voyage. This libel against the vessel was commenced the next day, demanding full wages for the entire voyage and also damages for the breach of contract.

Upon the matter of damages, the court at the hearing intimated that as the discharge if wrongful was at the home port, before the voyage had actually commenced, the libellants would not be entitled to demand full wages for the entire voyage, but would only be entitled to an indemnity in a reasonable sum for the services actually rendered, and compensation for any special damage, if any had been sustained; and such Judge Story, in Ex parte Giddings [Case No. 5,404], declares to be the settled rule in England, distinguishing between the case where the voyage is broken up, and the crew wrongfully dismissed before the voyage is begun, and the case where they are dismissed wrongfully after the voyage is begun, in which latter case only, are they by the law of England entitled to wages for the whole voyage.

By Ord. de la Mar. bk. 3, tit. 4, art. 3 (1 Valin, 686), it was provided that "if the voyage was broken up by the owners, master or merchants before the departure of the ship, the seamen hired by the voyage, by the run, shall be paid for the time by them spent in equipping the ship, and one-fourth part of the amount they would receive if the voyage had been completed; and those hired by the month shall be paid proportionately, according to the ordinary length of the voyage." Article 10 (1 Valin, 705), compelled the master, if he discharged a seaman without good cause before the voyage was begun, to pay him one-third of his wages, and the whole if discharged in the course of the voyage together with the expense of his return; and these amounts the owners were not required to refund to the master.

Definite proportions of the entire wages to be earned were allowed to the crew in case of wrongful dismissal before the voyage was begun, by various ancient ordinances and rules of the sea, but none of these have ever received the sanction or approval of courts of

---

[1] [Reported by Thomas Hawes Haskell, Esq., and here reprinted by permission.]

admiralty in England or this country, so far as the court is advised; but it has been deemed more just and equitable in each case to award to the seamen a full and complete indemnity for the breach of contract.

When the libellants came on board the brig on the 27th, they brought with them a straw bed and one blanket, which were claimed by Collins as his property; neither of the other libellants had bed or bedding of any kind. A German boy, who had shipped as an ordinary seaman, came with them, and he was equally destitute. An old man, Hawkins, accompanied them, who had not shipped as one of the crew, but had been rejected by the master on account of his age. An attempt was made by the runners of the boarding house to substitute him in place of one of the crew who had shipped and absconded. Hawkins was provided with a bed, bedding, chest and clothing suitable for the voyage; neither of the libellants had any chest, and whatever clothing they possessed was stowed in their bags, each having one. On inquiry of them, as witnesses, as to their clothing, they stated they had enough, but it was impossible to obtain from either of them a full and accurate description of it; each claimed he had a pair of mittens, but whether of cotton or wool they could not tell. When interrogated as to their socks, each asserted he had some, but could not say whether they were thick or thin, or of what material, and were uncertain as to the number of pairs. Some of them had no heavy frocks, but they stated had instead woolen shirts. Their clothing was left on board the brig and was afterwards overhauled and examined by the master in the presence of police officers and others, and he describes it generally as nothing but a lot of old rags. The master having at the time assigned as a reason for not allowing these men to complete the voyage their want of clothing, bedding, &c., and having discharged them from the vessel, was he justified in so doing?

It will not probably be contended by any one, that in the month of December for such a voyage, a master is obliged to receive his crew, if they should come on board either half naked, or clothed in their summer raiment without other outfits; and if this is conceded, the case at once resolves itself into the question, were these men suitably equipped for the voyage, prepared to perform their part of the contract?

There is no direct evidence before the court to show whether the George Burnham was provided with any heating apparatus in her forecastle, but it is understood by the court, that in vessels of her description, bound on such a voyage, it is not customary to furnish them with anything of the kind, though sometimes heat is received from the cook's galley, by an aperture in the partition separating the two compartments; and the court is of the opinion, that as the case is pre-

sented, the libellants were not suitably provided and in a proper condition to discharge the duties of seamen on the contemplated voyage. They were to leave this port in the latter part of December, and by the terms of the shipping articles were to return in this brig to her port of discharge, which would probably bring them upon the coast in February, the coldest, most severe and inclement month in the year; and it must be remembered, that their contract expressly stipulated that they were not to receive any advance abroad. It was their duty therefore before sailing, to provide themselves with a suitable outfit, such as would be reasonably fit and proper for them, to protect them from cold and exposure as far forth as was practicable for men called upon to perform the duties of seamen on board such a vessel on such a voyage. A single straw bed and one blanket only for three men on board a vessel bound off this coast in December and returning in February, it needs no argument to demonstrate were wholly inadequate for their protection and health. It is not unfrequently the case in such voyages, that the crew are for weeks exposed to the severest cold, the sea breaking over them, and every thing ice bound. In such condition what would have become of these men, with no other clothing or bedding than that brought by them on board? What warmth would a single blanket and a straw bed afford to a worn and chilly seaman in a cold forecastle, with every thing about him, including his clothing, wet and stiff with ice? They must all have been inevitably terrible sufferers from their exposure and improvidence, have had their hands and feet frost bitten, and become utterly incapable to discharge their duties as seamen; and it is by no means improbable that some, if not all, would have been so badly affected, as to be made cripples for life. Every season seamen are taken to the Marine Hospital here in such condition from exposure to the cold at sea, as to require amputations; and it is but two or three years since a sailor was before this court, both of whose limbs had been amputated above the knee on account of his injuries from such exposure.

When it is remembered that these men were not provided with proper protection for either their hands or feet,—for a single pair of mittens and one or two pairs of old socks are not deemed sufficient for that purpose,—the court can but hold that the libellants had not performed their part of the contract in not suitably preparing themselves to meet the ordinary perils and risks of the voyage. To be sure, it is nowhere expressly stipulated in the shipping articles that the crew shall thus be provided, but in this, as in many other contracts, there are implied obligations on both sides. Nothing is expressly stipulated by the master as to the provisions to be furnished by him to the crew;

.but it will not be questioned that the obligation was imposed upon him to provide such as are suitable and usual on such a voyage; and so likewise on the part of the seamen, the court holds without hesitation, that it is implied by their contract, that they will be provided with all needful apparel, reasonably suitable for their use and protection on the particular voyage for which they contract.

A vessel could hardly be deemed seaworthy, and great doubts are entertained whether an insurance would be binding, if a master knowingly allowed his crew to commence their voyage, so utterly destitute of necessary clothing as these libellants are shown to have been. In case they should encounter heavy severe weather, and meet with dis asters on this coast at this season of the year, they necessarily must soon have become utterly incapable to discharge their duties in the management of the ship, and the vessel and all on board from this cause would have been lost, unless assistance could be obtained from some other quarter. If these men had thus .suffered or perished from their own imprudence, the master would have been charged with a great want of humanity, and with grossest neglect of the comfort and safety of his crew; and the court therefore feels fully justified in deciding, that he not only had the legal right, but that it was his duty to act on this objection, taken by him at the time, to their destitute condition and want of necessary clothing, and as they did ·not offer to remedy the difficulty and procure what was reasonably necessary and proper, that they have no cause of complaint for his refusal to allow them to continue as a part of his crew.

It is claimed that Collins was better provided for than the other libellants; and it is true that he was possessed of a straw bed and one blanket; but it does not appear that in other respects he was any better equipped than the others; and the court therefore does not feel called upon to make any distinction or exception in his behalf.

It is argued that the want of clothing is .a matter merely personal to the seamen; that if they choose to go to sea in this condition they will be the only sufferers; but such is not the case; the rest of the crew and the officers have the deepest interest in all hands being well clothed and prepared to meet exposure. If one man is incapacitated, the others, from necessity and self-preservation, are obliged to discharge his duties. Extra labor is thus thrown upon the more ·prudent and careful, and if many of the crew become thus disabled, the greatest exer-·tions of the others may prove futile, and all on board perish by reason of the imprudence of their shipmates.

It may be urged that no precedent for these views is to be found in the reported decisions of the admiralty court; but questions are constantly arising, and as they are presented for its decision, it is the duty of a court of admiralty to apply to their solution the well recognized and long established principles of maritime law, sanctioned and adopted by all admiralty courts, rather than to spend a long time in searching to ascertain if the precise question involved has ever been adjudicated by any co-ordinate court, yielding of course in submission to the authority of any appellate court, which has expressly determined it.

Seamen are the wards of the court of admiralty, and that court has ever been in the habit of extending towards them a peculiar protecting favor and guardianship. Reckless, thoughtless and improvident, regarding only their present comfort and enjoyment, taking no thought or care for the future, they are when on shore easily overreached, exposed to ·all sorts of temptations, and under the control and authority of those, who so long as they control the seamen's wages, are ever ready to tempt and aid them in the gratification and indulgence of every desire, however detrimental and injurious it may be, pandering to their lowest appetites until their earnings are exhausted, and then thrusting them on board any kind of a vessel that can float long enough to leave the port, at the most inclement season, and in most instances in utter destitution and need of every requisite for their protection on the voyage. The court cannot therefore question, that it is as much its duty to intervene and protect seamen against their own reckless improvidence, and to require them to provide themselves with necessary raiment when they commence a voyage of danger and exposure, as it is to take care that they are not imposed upon by the superior shrewdness of the master and owners.

This construction of the·law must tend to greatly promote the welfare of the seaman, as he will not only be much better protected against suffering and exposure, but when on shore will be induced to lay aside a portion of his hard earned wages to furnish him with the necessary supplies. His earnings, instead of being wasted and productive of injury rather than benefit to him, will contribute to his comfort and enjoyment; he will not be so completely under the control of his worthless associates, who care only for the plunder they can gain from him; possessing some little property, he will soon become more independent, and his own master when on shore; he will acquire habits of thrift, temperance and economy, and grad-·ually think more of. himself and his opportunities for improvement; he will abandon ·his bad habits and low company, will en-·deavor to rise in his calling above the grade of a seaman, and to educate ·himself for the position of an officer, and thus in every way .his own welfare as well as the interest of commerce will be greatly advanced and promoted. The court well remembers, when at this port it was almost· invariably the case

that every sailor possessed his sea-chest wel' filled with comfortable clothing; and the sooner this custom is revived, the better will it be for the seamen and all interested in navigation, as it is confidently believed it will do much to improve the character of our sailors, both for seamanship, and good conduct and behavior, which the court has reason to believe are much below the standard of thirty or forty years since.

Another cause for the discharge of these seamen, which was assigned at the time by the master, was that he had learned they were quarrelsome and intended mischief. It appears that the libellants are all Englishmen who shipped under the names of Edward Collins, James Smith, and Martin McDonald. They admitted, with considerable evasion and reluctance, that they were stepbrothers, and certainly from the commencement, all manifested a very strong desire to ship in this particular vessel. At the time they applied to the master to ship them, he referred them to the shipping master, but stated that he was bound to have none but quiet, peaceable men, and this requirement of the master was enjoined by him on the shipping master, and by him communicated to the libellants when they shipped. One or two of them, in disregard of the provision in the articles, came on board with their sheath knives strapped around them, and they obeyed the orders of the officers as appears with about the usual amount of grumbling and dilatoriness. The master had been advised that they were bad fellows, of bad reputation, and was not satisfied with their behavior while on board; and for this reason, as well as their want of clothing, he discharged them, offering to pay them for the time that they had been employed. The court is satisfied that the master formed a correct opinion as to the character of these men, for it now appears, although it was not at that time known to the master, that on Christmas the libellants all went on board the steamer Forest City, and without justification assaulted a number of her crew, and that Collins was especially active, flourishing his knife and cutting the clothing of one of them. The excuse assigned for their conduct is, that they accompanied a third party on board, and that he was assaulted by some of the crew of the Forest City, and the libellants thereupon interfered to keep the peace. The court cannot consider the indiscriminate slashing by Collins with his knife of whichever of the Forest City crew happened to be near him, as a judicious and laudable method to preserve the peace. Such behavior rather manifests the fighting, quarrelsome disposition, which the master had protested against, and for this cause also the court holds their discharge was justifiable. The master having offered to pay the libellants for their time whilst on board, a decree may be entered for that amount without costs.